THIS OPINION IS A
PRECEDENT OF
THE TTAB

Mailed: February 14, 2008
PTH

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

In re ic! berlin brillen GmbH

————

Serial No. 79005455

————

Teresa C. Tucker of Grossman, Tucker, Perreault & Pfleger, PLLC for ic! berlin brillen GmbH.

Amy Gearin, Trademark Examining Attorney, Law Office 115 (Tomas V. Vlcek, Managing Attorney).

————

Before Hohein, Hairston and Bergsman, Administrative Trademark Judges.

Opinion by Hairston, Administrative Trademark Judge:

On July 7, 2004 ic! berlin brillen GmbH filed an application to register as a trademark on the Principal Register the design shown below for "spectacles, sunglasses" in International Class 9.[1]

———

[1] Serial No. 79005455, filed under the Madrid Protocol, Section 66(a) of the Trademark Act, 15 U.S.C. § 1141(f), based on International Registration No. 0833581, issued July 7, 2004.



Applicant subsequently amended the application to seek registration under Trademark Act Section 2(f). The mark is described as follows:

> The mark consists of an earpiece for frames for sunglasses and spectacles which comprises three "fingers" at the end near the hinge connecting the earpiece with the lens-enclosing portion of the frame. The three "fingers" are separated by openings that create two distinct lines. The upper line of the earpiece is straight and the bottom line is angled upward toward the portion that rests on the wearer's ears. The entire configuration resembles an asymmetrical fork. There exists a hinge at the point where the configuration joins the lens-enclosing portion of the spectacle or sunglasses frame, but the hinge feature is not claimed as a part of the configuration. The broken or dotted lines show the mark's position on the goods.

The trademark examining attorney has finally refused registration under Trademark Act Sections 1, 2, and 45 on the ground that the design sought to be registered (hereinafter "earpiece design") is not inherently distinctive and that applicant has not established acquired distinctiveness.

2

Applicant and the examining attorney have filed briefs.

Since applicant seeks registration under Trademark Act Section 2(f), the only issue before us is whether applicant has established acquired distinctiveness.

It is applicant's position that, as a result of its use for over five years, sales, and advertising and promotional efforts, the earpiece design sought to be registered has become distinctive of applicant's eyewear. In support of its claim of acquired distinctiveness, applicant submitted the declaration and supplemental declaration of its Director and General Manager, Juliette Cook. Ms. Cook alleges that the earpiece design has become distinctive of applicant's goods through exclusive and continuous use of the design in commerce in the United States since at least as early 2001; that applicant markets dozens of styles of eyewear, with each style featuring the earpiece design; that from 2001 through October 2006 applicant sold approximately 40,000 units of eyewear in the United States, including 15,000 units in 2006 alone; that applicant promotes and advertises its eyewear through magazine advertisements, product literature, direct sales, the Internet, celebrity placements, and national and international trade shows directed at optical products

3

purchasers; and that applicant spent approximately $115,000 marketing its eyewear in 2006 alone.  Applicant also submitted samples of its print and Internet advertising; photographs of celebrities wearing its eyewear; and ten uniformly worded customer declarations from opticians. Attached to each declaration is an exhibit referred to as "Exhibit A" featuring a photograph of applicant's earpiece design.  Each declarant states that he/she is a customer of applicant and is familiar with applicant's products and trademarks as a result of purchases made over periods ranging from 18 months to six years.  Further, each declarant states, in relevant part, that:

> I am familiar with the earpiece design of the spectacle marketed by ic! berlin brillen GmbH that has the shape shown in the drawing attached hereto as Exhibit A.  When I see this particular shape I recognize the product as being a product of ic! berlin brillen GmbH.
>
> It is my understanding that the shape of this product design indicates products produced by ic! berlin brillen GmbH and not by any other company.
>
> It is my understanding that the product design shown in Exhibit A has acquired in the trade the meaning of spectacles and spectacle frames produced only by ic! berlin brillen GmbH.
>
> Many of my customers ask for ic! berlin brillen GmbH spectacles by referring to the design shown in Exhibit A, and expect that all products comprising that design will come from the same source and will be of equal quality with all other products from that source.

The examining attorney takes the position that there is little evidence that the ultimate purchasers of eyewear would perceive the earpiece design as an indication of source and that the evidence submitted by applicant is not persuasive. Specifically, the examining attorney argues that there is no evidence of "look for" advertising or promotion of the earpiece design as a trademark for applicant's eyewear. According to the examining attorney, the mere fact that applicant's advertisements and promotional materials contain pictures of its eyewear does not mean that the ultimate purchasers recognize the earpiece design as a trademark.

Applicant, in response, maintains that:

> …. the absence of "look for" advertising or promotion does not mean that consumers do not recognize the design as applicant's trademark. Applicant's goods by their nature, are small, narrow, and of little mass. The portion of the goods that is most visible is the earpiece. Eyewear manufacturers use the earpiece to display their trademarks. This is the part of the eyewear that is the most easily viewed portion of the product. Accordingly, the Spectacle Earpiece Design mark is immediately viewed and one's attention is drawn to that portion of the eyewear whether it is seen in person or in photographs in advertisements. This is also why celebrity product placements are used in the eyewear industry since it gets the distinctive look of the eyewear into the public eye. (citations omitted)
> (Brief at 10).

The burden of proving a prima facie case of acquired distinctiveness in an ex parte proceeding rests with applicant. Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd., 840 F.2d 1572, 1576, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988); citing Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1405, 222 USPQ 939, 942 (Fed. Cir. 1984).

After careful consideration of the evidence submitted in this case, we are not persuaded that the earpiece design sought to be registered has become distinctive of applicant's eyewear. The chief reason is the absence of evidence of the advertising and/or promotion by applicant of the earpiece design as a trademark. While the earpiece design is visible on the eyewear shown in applicant's print advertisements and Internet web pages, and in the celebrity photographs of record, there is nothing to indicate that the ultimate purchasers would view this particular feature as anything more than a component of the eyeglass/sunglass frame.

In this regard, we note that one of applicant's magazine advertisements features a photograph of applicant's eyeglasses and states:

> The latest German engineering, now in sight. Presenting ic! berlin's latest prescription and sunglass collection for 2005. Available now, and only at Glance. Highly durable with incredible fashion sense, the stainless steel frames and

6

       patented hinges flex and form to fit your face.
       And, as always, you'll find them to be remarkably
       priced.

There is no reference, however, to the earpiece design. Similarly, applicant's web pages feature photographs of its eyewear along with information concerning frame models, weight, and color options. Again, there is no mention of the earpiece design.

With respect to the celebrity photographs, they do not serve to show customer perception of the earpiece design. They are simply head and body shots of celebrities who are wearing applicant's eyewear. Although we recognize that in most of the photographs the celebrities are posing in such a manner that the earpiece design is visible, these photographs do not serve to show customer recognition of the source-identifying significance of the earpiece design, nor can we infer such recognition from this evidence. In short, there is simply no evidence that the earpiece design has been advanced as a trademark for applicant's eyewear.

Applicant contends that "look for" advertising and/or promotion is unnecessary because "[e]yewear manufacturers use the earpiece to display their trademarks." (Brief at 10). There is no evidence, however, to support applicant's contention that eyewear manufacturers typically display

their trademarks on the earpieces of their eyewear. It may well be that eyewear manufacturers typically display word and logo marks on the earpieces of their eyewear, but word and logo marks are different in nature from applicant's earpiece design. In short, we are unable to conclude that the ultimate consumers would view the earpiece design as applicant's trademark simply because it is the earpiece portion of the eyewear frame.

Insofar as the declarations from opticians are concerned, they are entitled to some weight because each declarant states: (1) the length of time during which he/she has purchased goods from applicant, (2) that he/she understands the earpiece design to indicate eyewear from applicant; and (3) that many of his/her customers ask for applicant's eyewear by the earpiece design. However, the statements of ten retailers do not establish an association of the earpiece design with applicant by other than an extremely small number of the purchasing public.

Further, we find that applicant's sales and advertising figures are not especially impressive such that they establish acquired distinctiveness. Applicant has provided no evidence which indicates the relative size of its sales to those of competitors. Nonetheless, we believe it is safe to say that millions of persons in the United

States wear eyeglasses and/or sunglasses. Thus, applicant's eyewear sales of 40,000 units from 2001 to October 2006 would constitute a small portion of the total sales of eyewear for this period. In any event, even assuming that applicant's eyewear is popular, this may well result from features of its eyewear which are deemed superior by the purchasing public, e.g., "highly durable;" "stainless steel frames and patented hinges [which] flex and form to fit [the] face." (Applicant's magazine advertisement). Moreover, it is well settled that even compelling sales and advertising figures do not always amount to a finding of acquired distinctiveness. See In re Boston Beer Co., L.P., 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) ($85,000,000 in annual sales revenues and $2,000,000 in advertising expenditures found insufficient to establish acquired distinctiveness); Goodyear Tire & Rubber Co. v. Interco Tire Corp., 49 USPQ2d 1705 (TTAB 1998) ($56,000,000 sales revenues and 740,000 tires sold insufficient to show acquired distinctiveness of tire tread design.)

Lastly, with respect to applicant's declaration of exclusive and continuous use for a period of five years, while this may serve as prima facie evidence of acquired distinctiveness, the language of the statute is permissive

9

and the weight to be accorded this kind of evidence depends on the facts and circumstances of the particular case. See Section 2(f) of the Trademark Act, 15 U.S.C. Section 1052(f). Given the absence, however, of any evidence showing promotion of the earpiece design as a trademark for applicant's goods and applicant's rather limited market share, a period of five years substantially exclusive and continuous use is insufficient to establish acquired distinctiveness.

Accordingly, based upon consideration of all the evidence of record, we conclude that applicant has failed to establish that the earpiece design involved in the application before us has acquired distinctiveness within the meaning of Section 2(f) of the Trademark Act.

**Decision**: The refusal to register is affirmed.